**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.: 14-CV-62061**

| | |
|---|---|
| U.S. COMMODITY FUTURES<br>TRADING COMMISSION, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| JAY BRUCE GROSSMAN | )<br>) |
| Defendant. | )<br>) |
| _____ | ) |

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF**
**AND PENALTIES UNDER THE COMMODITY EXCHANGE ACT**

The U.S. Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, hereby alleges as follows:

## I.     SUMMARY

1.      Defendant Jay Bruce ("J.B.") Grossman ("Grossman"), a Florida attorney, aided and abetted multiple clients in their operation of unlawful precious metals schemes.  The firms Grossman represented claimed to sell physical metals, such as gold, silver, platinum, palladium, and copper, to the retail public on a leveraged, margined, or financed basis.  Despite charging customers hefty sales commissions, storage fees, and interest, none of these firms actually sold physical metals or disbursed loans to customers, and Grossman knew it.  Nevertheless, he aided his clients in crafting the illusion that their schemes were legitimate and complied with the law, ultimately enabling his clients to defraud thousands of unsophisticated retail customers out of millions of dollars.

2.      Grossman began aiding and abetting clients in precious metals schemes at least as early as 2009.  Effective July 16, 2011, the Dodd-Frank Wall Street Reform and Consumer

Protection Act of 2010 ("Dodd-Frank"), Public Law 111-203, 124 Stat. 1376 (2010), granted the CFTC new authority to regulate retail commodity transactions "as if" they were futures contracts and, as a result, explicitly made the schemes run by Grossman's clients subject to the CFTC's prosecutorial authority.

3.     Specifically, Grossman willfully aided and abetted Hunter Wise Commodities, LLC ("HW Commodities"), Hunter Wise Credit, LLC ("HW Credit"), and Hunter Wise Trading, LLC ("HW Trading") (collectively, "Hunter Wise") and AmeriFirst Management LLC ("AmeriFirst"), which held themselves out as metals "clearing firms" for their respective networks of metals "dealers" that solicited the retail public, in engaging in unlawful off-exchange retail commodity transactions and committing fraud in connection with those transactions on and after July 16, 2011.  He is therefore liable for Hunter Wise's and AmeriFirst's violations of Sections 4(a), 4b, and 6(c)(1) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6(a), 6b, and 9(1) (2012), and CFTC Regulation ("Regulation") 180.1, 17 C.F.R. § 180.1 (2013), pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a) (2012).

4.     Grossman also willfully aided and abetted Lloyds Commodities, LLC ("Lloyds Commodities"), Lloyds Commodities Credit Company, LLC ("Lloyds Credit"), and Lloyds Services, LLC ("Lloyds Services") (collectively, "Lloyds"), which acted as an intermediary between Hunter Wise and certain of its metals dealers, in confirming the execution of and conducting business in the United States for the purpose of accepting orders for, or otherwise dealing in, unlawful off-exchange retail commodity transactions on and after July 16, 2011.  He is therefore liable for Lloyds' violation of Section 4(a) of the Act, 7 U.S.C. § 6(a), pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a).

5.      Further, Grossman willfully aided and abetted several Hunter Wise metals dealers that solicited the retail public in engaging in unlawful off-exchange retail commodity transactions on and after July 16, 2011.  These metals dealers included Secured Precious Metals International, Inc. ("SPMI") and Secured Precious Metals Management, Inc. ("SPMM") (collectively, "Secured Precious Metals") and Joseph Glenn Commodities LLC ("JGC") and JGCF LLC ("JGCF") (collectively, "Joseph Glenn").  He is therefore liable for their violations of Section 4(a) of the Act, 7 U.S.C. § 6(a), pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a).

6.      Unless restrained and enjoined by this Court, Grossman is likely to continue engaging in the acts and practices alleged in this complaint or in similar acts and practices.

7.      Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), to enjoin Grossman's unlawful acts and practices and to compel his compliance with the Act.  In addition, the CFTC seeks civil monetary penalties and such other equitable relief as this Court may deem necessary or appropriate.

## II.      JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), which authorizes the CFTC to seek injunctive relief in the proper district court of the United States against any person whenever it appears to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder.

9.      The CFTC has jurisdiction over the retail commodity transactions at issue in this matter pursuant to Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D) (2012).

10.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Grossman transacted business in this District and certain of the acts

and practices in violation of the Act have occurred, are occurring, or are about to occur within this District.

### III.    THE PARTIES

11.    Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act, 7 U.S.C. §§ 1 *et seq.* (2012), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2013).

12.    Defendant **Jay Bruce Grossman** is licensed to practice law in Florida, New York, and the District of Columbia.  He maintains a law practice in Fort Lauderdale, Florida under the law firm name J.B. Grossman, P.A. ("JBGPA"), and he previously practiced law at GrossmanGreenberg, LLC ("GrossmanGreenberg").  Grossman was registered with the CFTC as an associated person ("AP") of UBS Financial Services, Inc. from approximately April 1982 until March 1984, as an AP of Donaldson Lufkin & Jenrette Futures, Inc. from approximately March 1984 until September 1985, as an AP of Refco, LLC from approximately September to November 1985, and as an AP of Man International, Inc. from approximately December 1986 until October 1988.  He has not been registered with the CFTC in any capacity since then.

### IV.    OTHER RELEVANT PARTIES

13.    **Hunter Wise Commodities, LLC** was formed as a California company in July 2007 and registered as a Nevada company in January 2010.  It maintained business addresses in Las Vegas, Nevada and Irvine, California and held itself out on its website as "a physical commodity trading company, wholesaler, market maker, back-office support provider, and finance company."  Its principals were Harold Edward Martin ("Martin"), the President and Chief Operating Officer ("COO"), and Fred Jager ("Jager"), the Chief Executive Officer ("CEO").  In November 2009, HW Commodities retained Grossman for legal services related to

4

"maintaining and developing a precious metals dealer business."  **Hunter Wise Credit, LLC**

and **Hunter Wise Trading, LLC**, formed as Nevada companies in January 2010, were wholly-

owned subsidiaries of HW Commodities and shared its Las Vegas, Nevada business address.

Together, the three entities operated as a single common enterprise.  Between July 16, 2011 and

February 25, 2013, when the U.S. District Court for the Southern District of Florida entered a

preliminary injunction against Hunter Wise in *U.S. Commodity Futures Trading Commission v.*

*Hunter Wise Commodities, LLC*, Case No. 9:12-cv-81311-DMM (S.D. Fla., filed Dec. 5, 2012)

("*CFTC v. Hunter Wise*"), Hunter Wise claimed to sell physical metals and provide financing for

those sales through a network of dealers that solicited the retail public.  Hunter Wise has never

been registered with the CFTC in any capacity.

     14.     **Lloyds Commodities, LLC** was organized as a Florida company called "Burbage

Financial Group, LLC" in November 2009 and renamed "Lloyds Commodities, LLC" in March

2010.  Its principals were James Burbage ("Burbage") and James Gaudino ("Gaudino").  Its

affiliates included **Lloyds Services, LLC**, which was organized in Florida in January 2011 and

shared a Palm Beach Gardens, Florida business address with Lloyds Commodities, and **Lloyds**

**Commodities Credit Company, LLC**, which was organized as a Nevada company in October

2010 and shared a Las Vegas, Nevada business address with Hunter Wise.  Together, the three

Lloyds entities operated as a single common enterprise.  In September 2010, Lloyds

Commodities retained Grossman for services involving its metals dealer business.  Lloyds

Commodities listed its registered agent with the Florida Secretary of State as

GrossmanGreenberg beginning in October 2010 and as JBGPA beginning in April 2011, while

Lloyds Services listed JBGPA as its registered agent beginning with its incorporation in January

2011.  Between July 16, 2011 and February 25, 2013, when the U.S. District Court for the

Southern District of Florida entered a preliminary injunction against Lloyds in *CFTC v. Hunter Wise*, Lloyds acted as an intermediary between Hunter Wise and approximately 30 of its metals dealers.  Lloyds has never been registered with the CFTC in any capacity.

15.     **Secured Precious Metals International, Inc.** and **Secured Precious Metals Management, Inc.** were incorporated in Delaware and Florida, respectively, in July 2011 and together maintained a business address in Fort Lauderdale, Florida.  In July 2011, SPMM and its principal, Linda Laramie ("Laramie"), retained Grossman for assistance in forming a dealer relationship with Hunter Wise.  Between July 16, 2011 and June 20, 2012, when it ceased doing business, Secured Precious Metals acted as a Hunter Wise dealer by soliciting retail customers to enter into retail commodity transactions and passing order details and customer funds on to Hunter Wise.  Secured Precious Metals has never been registered with the CFTC in any capacity.

16.     **Joseph Glenn Commodities LLC** and **JGCF LLC** were formed in Florida in November and December 2010, respectively.  In December 2010, JGC and its principals, Scott Newcom ("Newcom") and Anthony Pulieri ("Pulieri"), retained Grossman for assistance in forming a dealer relationship with Hunter Wise.  Together, JGC and JGCF maintained a business address in Boca Raton, Florida.  Beginning in April 2011, both entities listed JBGPA as their registered agent with the Florida Secretary of State.  Between July 16, 2011 and June 20, 2012, when it ceased doing business, Joseph Glenn acted as a Hunter Wise dealer by soliciting retail customers to enter into retail commodity transactions and passing order details and customer funds on to Hunter Wise.  Joseph Glenn has never been registered with the CFTC in any capacity.

17.     **AmeriFirst Management LLC** was formed as a Florida limited liability company in October 2011 and maintained a business address in Fort Lauderdale, Florida.  Its

principals were John D'Onofrio ("D'Onofrio"), Scott Piccininni ("Piccininni"), and George

Sarafianos.  In approximately November 2011, AmeriFirst retained Grossman to assist in

establishing and developing a metals clearing firm business.  Between November 2011 and

February 25, 2013, when it ceased doing business, AmeriFirst held itself out as a precious metals

wholesaler and clearing firm, claiming to sell physical metals and provide financing for those

sales through a network of dealers that solicited the retail public.  AmeriFirst has never been

registered with the CFTC in any capacity.

## V.     RELATED ACTIONS

18.     In *CFTC v. Hunter Wise*, the U.S. District Court for the Southern District of

Florida issued a partial summary judgment ruling finding that between July 16, 2011 and

February 25, 2013, Hunter Wise entered into, executed, and confirmed the execution of orders

for off-exchange retail commodity transactions in violation of Section 4(a) of the Act, 7 U.S.C.

§ 6(a).  (Order on the Parties' Mot. for Summ. J. 10-14, Feb. 19, 2014, ECF No. 281; 2014 WL

652888.)  After conducting a bench trial, the Court entered an Opinion and Order finding that

Hunter Wise engaged in fraud by misrepresenting to customers that Hunter Wise purchased and

stored physical metals on their behalf in violation of Sections 4b and 6(c)(1) of the Act, 7 U.S.C.

§ 6b, 9(1), and Regulation 180.1, 17 C.F.R. § 180.1.  (Opinion and Order 30-48, May 16, 2014,

ECF No. 303; 2014 WL 2022239.)

19.     In the same matter, the Court entered a Consent Order finding that between

July 16, 2011 and February 25, 2013, Lloyds confirmed the execution of and conducted an office

or business in the United States for the purpose of accepting orders for, or otherwise dealing in,

off-exchange retail commodity transactions in violation of Section 4(a) of the Act, 7 U.S.C. §

6(a).  (Consent Order for Permanent Inj., Civil Monetary Penalty and Other Equitable Relief 7-8,

Feb. 5, 2014, ECF No. 254.)

20.     In an administrative action against Secured Precious Metals, the CFTC entered an Order finding that between July 16, 2011 and June 20, 2012, Secured Precious Metals offered to enter into, entered into, and confirmed the execution of off-exchange retail commodity transactions while acting as a Hunter Wise dealer in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a).  (Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions, *In the Matter of Secured Precious Metals International Inc., et al.*, CFTC No. 13-12, [2012-2013 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 32,526 at 72,079 (Jan. 28, 2013).)

21.     In a similar administrative action against Joseph Glenn, the CFTC entered an Order finding that between July 16, 2011 and June 20, 2012, Joseph Glenn offered to enter into, entered into, and confirmed the execution of off-exchange retail commodity transactions while acting as a Hunter Wise dealer in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a).  (Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions, *In the Matter of Joseph Glenn Commodities LLC, et al.*, CFTC No. 13-18, [2012-2013 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 32,526 at 72,283 (Mar. 27, 2013).)

22.     In *U.S. Commodity Futures Trading Commission v. AmeriFirst Management LLC*, Case No. 0:13-cv-61637-WPD (S.D. Fla., filed July 29, 2013), the U.S. District Court for the Southern District of Florida entered a Consent Order finding that between November 2011 and February 25, 2013, AmeriFirst offered to enter into, entered into, confirmed the execution of, and conducted an office or business in the United States for the purpose of accepting orders for, or otherwise dealing in, off-exchange retail commodity transactions in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a); made false representations and omissions of material fact to retail

customers in violation of Section 4b of the Act, 7 U.S.C. § 6b; and employed deceptive devices or contrivances in connection with contracts of sale of commodities in interstate commerce in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1, 17 C.F.R. § 180.1. (Consent Order of Permanent Injunction and Other Statutory and Equitable Relief 5-9, Sept. 11, 2013, ECF No. 17.)  On July 24, 2014, the Court entered a Supplemental Consent Order in the same matter, imposing restitution and civil monetary penalties against AmeriFirst and its principals.  (Supplemental Consent Order Assessing Restitution and a Civil Monetary Penalty 5-9, July 24, 2014, ECF No. 28.)

## VI.    STATUTORY BACKGROUND

23.    In response to widespread retail fraud involving products that functioned like futures contracts but were camouflaged as spot transactions to evade the CFTC's reach, Congress provided the CFTC with a "fraud fix" for off-exchange retail commodity transactions in all commodities and new authority to prohibit fraudulent and manipulative conduct in the much-publicized Dodd-Frank Act.  As a result, it has been unlawful under the Act to conduct retail commodity transactions fraudulently or other than on a regulated exchange since July 16, 2011, and the Act and Regulations have broadly prohibited the use of manipulative or deceptive devices, including in connection with contracts of sale of any commodity in interstate commerce, since August 15, 2011.

24.    Specifically, Section 2(c)(2)(D) of the Act, effective July 16, 2011, applies to "any agreement, contract, or transaction in any commodity" that is entered into with, or offered to, a non-eligible contract participant ("ECP") "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis."  7 U.S.C. § 2(c)(2)(D)(i).  Any such "retail commodity transaction" is subject to

Sections 4(a) (prohibiting off-exchange contracts of sale of a commodity for future delivery), 4(b), and 4b (prohibiting fraud in connection with contracts of sale of a commodity for future delivery) of the Act, 7 U.S.C. §§ 6(a), 6(b), 6b, "as if" the transaction was a contract of sale of a commodity for future delivery.  7 U.S.C. § 2(c)(2)(D)(iii).  Section 2(c)(2)(D) of the Act excepts certain transactions from its application, including, in relevant part, any contract of sale that "results in actual delivery within 28 days."  7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa).

25.    The Act defines an ECP, in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.  7 U.S.C. § 1a(18)(xi).  Individuals who fail to meet this threshold are commonly referred to as "retail customers."

26.    Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), effective August 15, 2011, makes it unlawful for any person directly or indirectly to use or employ any manipulative or deceptive device or contrivance in violation of the Regulations in connection with any contract of sale of any commodity in interstate commerce or for future delivery.  Regulation 180.1, 17 C.F.R. § 180.1, also effective August 15, 2011, makes it unlawful for any person directly or indirectly, in connection with any contract of sale of any commodity in interstate commerce or for future delivery, to intentionally or recklessly use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud.

27.    Section 13(a) of the Act, 7 U.S.C. § 13c(a), provides, in relevant part, that any person who commits or willfully aids, abets, counsels, commands, induces, or procures the

commission of a violation of the Act or Regulations, or who acts in combination or concert with any other person in any such violation, may be held responsible for such violation as a principal.

## VII.   FACTS

**A.   Grossman Aided and Abetted Hunter Wise's Fraudulent Scheme**

      **1.   Background of Hunter Wise's Business Model**

28.   Between at least July 16, 2011 and February 25, 2013, Hunter Wise operated a nationwide scheme in which it purported to sell physical metals, including gold, silver, platinum, palladium, and copper, to unsuspecting retail customers in off-exchange transactions on a leveraged, margined, or financed basis through a network of metals dealers.

29.   Hunter Wise recruited numerous metals dealers, including Secured Precious Metals and Joseph Glenn, to operate on the ground level of its scheme.  Through websites and by phone, these dealers solicited retail customers and prospective retail customers throughout the United States to enter into retail commodity transactions.  Their sales pitches typically included the following claims:  (1) customers could purchase physical metals by paying as little as 20% of the purchase price; (2) the dealer would lend the customer the remaining portion of the purchase price and charge interest on the loan; (3) the customer would receive title to the physical metals; and (4) the dealer would store the physical metals for the customer.

30.   However, when a customer placed an order to purchase physical metals, the dealer failed to purchase and store any physical metals or disburse any loan funds.  Instead, the dealer simply passed order details and customer funds up the chain to Hunter Wise, either directly or through Lloyds, which acted as an intermediary between Hunter Wise and approximately 30 of its metals dealers.  Dealers received commissions from Hunter Wise and, if the dealer was in Lloyds' network, from Lloyds as well.  Hunter Wise further compensated dealers by giving them a cut of the numerous fees collected from customers.

31.     Lloyds purported to sell physical metals to and provide various services for the metals dealers in its network for their retail commodity transactions.  In reality, Lloyds merely transmitted orders and customer funds from metals dealers to Hunter Wise, and the cut it received only served to increase the amount of fees collected from customers.

32.     Hunter Wise controlled this operation.  It purported to sell physical metals in connection with retail commodity transactions.  It further purported to store those metals and provide financing for partially-paid purchases.  But instead of selling or storing metals, Hunter Wise deposited the customer funds it received into its own bank accounts.  It then used a portion of those funds as margin to trade derivatives, including futures, forwards, and rolling spot contracts, in its accounts at A-Mark Precious Metals, Inc. ("A-Mark"), Standard Bank Plc ("Standard Bank"), Natixis Commodity Markets Ltd., R.J. O'Brien, and OANDA in order to manage its exposure to customer orders.  Hunter Wise did not own, possess, or have title to physical metals as a result of these trades, a fact made clear in Hunter Wise's account documents with these firms, nor did it actually deliver physical metals to Lloyds, metals dealers, or retail customers in connection with retail commodity transactions.

33.     Between July 16, 2011 and February 25, 2013, more than 3,200 customers lost more than $52 million after entering into retail commodity transactions with Hunter Wise and its dealers.  Nearly all of these customers were retail customers and not ECPs, as that term is defined in the Act.

### 2.     Grossman's Role in Hunter Wise's Fraudulent Scheme

34.     Grossman served as legal counsel for firms at all levels of Hunter Wise's retail commodity transactions scheme, including Hunter Wise, Lloyds, and several metals dealers.  His role went well beyond the provision of legal advice, however.  He knew that even after July 16, 2011, when Dodd-Frank made it unlawful to conduct retail commodity transactions fraudulently

or off-exchange, Hunter Wise did not actually sell physical metals to dealers or retail customers, store metals, or disburse loans.  Nevertheless, Grossman convinced firms to become dealers for Hunter Wise and Lloyds, and he helped defraud retail customers by preparing documents, including account agreements and commodity transfer forms, that he knew would deceive customers throughout the lifecycle of their retail commodity transactions.

      **a.**    **Grossman knew that Hunter Wise did not sell or store physical metals or disburse loans to metals dealers or retail customers long before July 16, 2011**

35.    Grossman was well-versed in the inner workings of Hunter Wise's business and has long been aware that Hunter Wise did not sell or store physical metals for or disburse loan funds to its dealers or retail customers.  For example, in approximately 2008 and again in 2009, Grossman was hired by prospective Hunter Wise metals dealers to perform due diligence on Hunter Wise.  In that capacity, Grossman reviewed the contracts Hunter Wise used with its dealers and visited the Hunter Wise office in California at least once, where he met with Hunter Wise President and COO Martin, CEO Jager, and others.  During Grossman's visit, Martin told him that Hunter Wise's inventory consisted of "positions with banks," not physical metals. Grossman also learned that Hunter Wise did not disburse funds in connection with financed transactions, but instead made book entries purporting to reflect loans.

36.    Grossman subsequently represented Hunter Wise from November 2009 through February 25, 2013, when the U.S. District Court for the Southern District of Florida enjoined Hunter Wise, Lloyds, and certain of their metals dealers from operation in *CFTC v. Hunter Wise*.

37.    Grossman was well aware that Dodd-Frank made it unlawful under the Act to conduct retail commodity transactions fraudulently or off-exchange, unless actual delivery was made within 28 days.  However, Grossman knew that when Dodd-Frank went into effect on July 16, 2011, Hunter Wise elected not to shut down or change its business model to comply with the

new requirements for retail commodity transactions, either by making delivery of metals to customers within 28 days or conducting its transactions on a regulated exchange.

38.     In his role as counsel for Hunter Wise, Grossman represented Martin in sworn investigative testimony before the CFTC in January 2011 and March 2012, before and after the effective date of Dodd Frank.  Both times, Martin was asked to identify the location of metals Hunter Wise claimed to have purchased, but could not do so.  In fact, Martin testified that the only way Hunter Wise could point to a depository and say the metal was there would be to buy its own inventory of product, finance it, and store it at a specified depository, but Hunter Wise did not conduct business that way because it would be much more costly.  Similarly, when Grossman represented Jager in sworn investigative testimony before the CFTC in March 2012, Jager could not identify any specific depositories in which Hunter Wise stored the metal it purportedly purchased.

39.     Grossman's knowledge that Hunter Wise did not sell or store physical metals was readily apparent in his statements to others, including after July 16, 2011, when Dodd-Frank went into effect.  For example, Grossman had several phone conversations with Gaudino, a principal of his client Lloyds, that were taped by Gaudino.  In one of those calls, which occurred on July 21, 2011, Grossman stated:

| Grossman: | And it was the guy [attorney John Giovannone, a former attorney for Hunter Wise] that wanted them to prove that there's metal at the end of the rainbow. |
| Gaudino: | Um-hmm. |
| Grossman: | And I was explaining that there isn't metal, there's an offset hedge. |
| Gaudino: | Right. |

40.     And in a November 21, 2011 phone call between Grossman and Gaudino that was taped by Gaudino, the following exchange occurred:

14

| | |
|---|---|
| Grossman: | I will speak to Ed [Martin] in a little while….He's of course looking for the transfer of commodities— |
| Gaudino: | Right. |
| Grossman: | —and he and I have a difference of opinion.  I'll have to do some work for him.  He wants us to say that there's really metal there. |
| Gaudino: | Um-hmm. |
| Grossman: | And there is metal. |
| Gaudino: | Right. |
| Grossman: | But you can't say that each individual person has metal stored on his behalf— |
| Gaudino: | Right. |
| Grossman: | —you know?  All you can say is that, that there is sufficient hedge on with another party— |
| Gaudino: | Right. |
| Grossman: | —to meet anybody's call, so [inaudible]. |
| Gaudino: | All right. |
| Grossman: | And I tell you what, I'm a little concerned that if you say that every person has metal held on his behalf, it's almost an untruth. |
| Gaudino: | Right.  Yeah, because, I mean, that's— |
| Grossman: | Right. |
| Gaudino: | —nearly impossible.  We all know that. |
| Grossman: | Right. |

41.    Grossman further demonstrated his knowledge that Hunter Wise lacked metal to sell to its dealers or retail customers on July 3, 2011, when he emailed edits and comments to Hunter Wise's auditor, Haskell & White LLP, for its use in preparing Hunter Wise's consolidated financial statements.  In his comments, Grossman admitted that "Since [Hunter

Wise] usually does not hold inventory it is inconsistent to say they get two day delivery from their supplier but provide immediate delivery to their customers."

42.     Similarly, in May 2012, Grossman drafted a written proposal seeking on Hunter Wise's behalf to obtain financing to purchase or otherwise gain access to an inventory of metals from another of Grossman's clients ("May 2012 Proposal").  In a May 27, 2012 email sharing the May 2012 Proposal with Martin and Jager, Grossman explained, "CFTC staff would like to see sales of precious and industrial metals to the retail public be designated to a specific and designated bar or lot of the precious and industrial metal" in light of Dodd-Frank.  In an implicit concession that Hunter Wise could not meet that standard, Grossman continued:  "The precious and industrial inventory Hunter Wise seeks is to provide that specific designation when it sells precious and industrial inventory to its retail dealers and they in turn sell the inventory to their retail public purchasers."

### b.     Grossman recruited Hunter Wise metals dealers

43.     Despite knowing the true nature of Hunter Wise's scheme, Grossman helped convince multiple firms to become Hunter Wise metals dealers by camouflaging its business model with a false veneer of legality.  In doing so, he helped ensnare additional unsuspecting retail customers in the scheme, increasing Hunter Wise's profits at their expense.

### 1.     Secured Precious Metals

44.     For example, Secured Precious Metals and its principal, Laramie, retained Grossman in July 2011, the very month Dodd-Frank became effective, for advice regarding the legality of Hunter Wise's business model.  Despite his knowledge that Hunter Wise did not actually sell physical metals to customers who entered into retail commodity transactions, Grossman advised Laramie that Hunter Wise's business model complied with Dodd-Frank and that Hunter Wise made actual delivery of metals within 28 days.

45.     Further, Grossman blatantly misrepresented to Laramie that Hunter Wise stored physical precious metals in a secured storage facility for customers, and that the CFTC regularly inspected Hunter Wise and its storage facility to verify and confirm the existence of the physical metals for customers.

46.     Based on Grossman's representations and consistent statements by Hunter Wise personnel, Secured Precious Metals became a metals dealer for Hunter Wise in July 2011.  It continued to operate in that capacity until June 20, 2012.  Hunter Wise records reflect that between July 16, 2011 and when it ceased operation, Secured Precious Metals took in more than $4.5 million in deposits from approximately 112 customers, who lost more than $3.5 million.

### 2.     Joseph Glenn

47.     Similarly, in the fall of 2010, Joseph Glenn's principals, Newcom and Pulieri, requested Grossman's assistance in establishing a relationship with Hunter Wise.  Despite his knowledge that Hunter Wise did not actually sell physical metals to customers who entered into retail commodity transactions, Grossman told Newcom and Pulieri that as Hunter Wise's attorney, he knew that Hunter Wise stored its metals in facilities certified by COMEX, a commodity exchange.  Grossman further stated that banks loaned funds to Hunter Wise that it, in turn, loaned to dealers.  These statements were patently false.

48.     Based in part on Grossman's representations, Joseph Glenn became a metals dealer for Hunter Wise in November 2010 and officially retained Grossman for advice regarding its metals dealer business in December 2010.  When Dodd-Frank became effective on July 16, 2011, Newcom asked Grossman if Hunter Wise would be "in the CFTC's crosshairs," or words to that effect, to which Grossman replied that Hunter Wise was doing business properly and that Joseph Glenn's business model was compliant with Dodd-Frank.  Accordingly, Joseph Glenn continued to operate as a Hunter Wise dealer until June 20, 2012, when it ceased doing business.

49.     Hunter Wise records reflect that between July 16, 2011 and when it ceased operation, Joseph Glenn took in more than $1.2 million in deposits from approximately 66 customers, who lost more than $780,000.

### 3.     LAM and Barclay Metals

50.     In August 2009, Grossman was retained to represent the Hunter Wise metals dealer that Burbage owned at the time, Lloyds Asset Management, LLC ("LAM").  In 2010, Burbage sold LAM to two of its employees, Sylvia Williams ("Williams") and Sean Stropp ("Stropp"), to focus on building Lloyds' business as an intermediary between Hunter Wise and certain of its dealers.

51.     Williams and Stropp retained Grossman in September 2010 to continue representing LAM, and Williams specifically asked Grossman if Hunter Wise had sufficient metal in storage to fulfill its obligations to retail customers.  Grossman assured Williams that as Hunter Wise's attorney, he had vetted Hunter Wise's metals inventory, and Hunter Wise "absolutely" had the metal.  He advised Williams to convey that information to LAM's salespeople and customers, and he even told Williams that if customers had questions, she could give them his phone number so he could personally confirm Hunter Wise's ownership of metals.  Grossman made all of these representations knowing that Hunter Wise did not actually sell physical metals to customers in its retail commodity transactions, and LAM passed these misrepresentations on to its retail customers.

52.     In March 2011, Williams and Stropp formed Barclay Metals, Inc. ("Barclay Metals"), which became a Hunter Wise dealer.  Barclay Metals continued operating as a Hunter Wise dealer after the effective date of Dodd-Frank and until it ceased doing business in June 2012.  Based on Grossman's previous misrepresentations to Williams that he had vetted Hunter Wise and that Hunter Wise "absolutely" had the metal, Barclay Metals misrepresented to its

18

retail customers, including after Dodd-Frank went into effect, that Hunter Wise had sufficient metal to fulfill its obligations to customers.

### c.     Grossman's misrepresentations reached retail customers

53.     Grossman's reach ultimately extended to Hunter Wise's retail customers, including those solicited by Secured Precious Metals, Joseph Glenn, and other dealers, in the form of fraudulent documents that Grossman prepared.  These documents created the illusion that customers were purchasing physical metals, receiving title to those metals, and receiving loans for the unpaid portion of the purchase price, thereby deceiving customers throughout the lifecycle of their retail commodity transactions with Hunter Wise.  Due to their nature as customer documents, Grossman expected and knew that customers would receive them.

### 1.     Customer agreements

54.     For example, on July 6, 2011, Grossman prepared the two customer agreements that Secured Precious Metals used with its customers.  The "Customer Purchase & Sale Agreement" described its purpose as "provid[ing] for the establishment of an account for Customer with [SPMI] for the purchase and sale of physical precious and industrial metal commodities."  It further stated that once customer funds were received, Secured Precious Metals would "deliver" the metals to the customer or to a bank or depository for safekeeping. The companion "Customer Loan, Security & Storage Agreement" described its purpose as "set[ting] forth the terms under which [SPMM] will lend to Borrower, from time to time…sums of money to purchase physical commodities."  These statements were blatant misrepresentations, since Secured Precious Metals did not purchase or store physical metals for, or loan money to, the retail customers it solicited.  And when Dodd-Frank went into effect a mere ten days later, these fraudulent misrepresentations were explicitly made a violation of the Act.  However even

after Dodd-Frank went into effect, Grossman did not advise Secured Precious Metals to alter or stop using the customer agreements.

55.     In January 2010, Grossman prepared Joseph Glenn's two customer agreements, which contained substantially the same statements as the customer agreements Grossman prepared for Secured Precious Metals.  Again, he did not advise Joseph Glenn that these statements were fraudulent, nor did he advise Joseph Glenn that Dodd-Frank explicitly made these fraudulent statements a violation of the Act when it became effective on July 16, 2011.

56.     As a result, from the moment they received their account opening documents, retail customers were deceived into believing they were purchasing physical metals from the dealer and receiving loans for the unpaid portion of the purchase price, when in fact they were not.  Grossman knew this, and he knew this deception continued to occur after Dodd-Frank went into effect.  Furthermore, due to the documents' very nature as customer agreements, Grossman expected and knew that his dealer clients would use them with their retail customers, and he made no effort to prevent their use after Dodd-Frank became effective.

### 2.     Commodity transfer forms

57.     Grossman also drafted or reviewed commodity transfer forms that he knew Hunter Wise generated and issued to retail customers each time they entered into a retail commodity transaction, either directly through Hunter Wise's web-based "portal" or by U.S. mail or overnight delivery from the dealer that solicited the customer.  These commodity transfer forms further misrepresented to customers that they were purchasing physical metal.

58.     For example, for most of the time it was in operation, Hunter Wise generated and issued to retail customers a "Transfer of Commodity" form that blatantly misrepresented the following:  "[Dealer name] hereby confirms that a depository ("Custodian") authorized by agreements referred to below has received custody of the goods and/or warehouse receipts

therefore ("commodities") identified above and to which you hold title."  Hunter Wise issued this version of its commodity transfer form to retail customers, including those solicited by Joseph Glenn, at least as late as March 2012.  Grossman specifically reviewed and discussed this Transfer of Commodity form with Joseph Glenn's principals, but he did not advise them or Hunter Wise to cease using the form, even though he knew that neither Joseph Glenn nor Hunter Wise purchased any metals to which it could pass title.

59.     In approximately April 2012, Grossman provided Hunter Wise with a replacement commodity transfer form that he had drafted.  Grossman's new "Transfer of Precious and Industrial Metals" was just as misleading as the original form, and he knew it.  For example, it stated that the dealer "either has on hand physical precious or industrial metal, or obligations to deliver precious and industrial metal upon full payment from dealers from…whom Dealer purchased ("Supplier") sufficient product to cover the amount of your purchase."  Grossman knew that none of Hunter Wise's dealers had metal "on hand" or purchased or stored physical metal from a supplier equal to the total amount of metal purchased by the retail customers they solicited.  Furthermore, Grossman knew that Hunter Wise, the "Supplier" contemplated in his Transfer of Precious and Industrial Metals, did not have metal "on hand" or purchase or store physical metals equal to the total amount of metal sold in retail commodity transactions.  He admitted as much when he included this language in his May 2012 Proposal seeking inventory for Hunter Wise and stated, "In fact, many if not most London metals dealer agreements provide only a commitment to deliver the economic value of the trade and not necessarily the actual metal."

60.     Grossman's Transfer of Precious and Industrial Metals also stated, "In the event this is a purchase, you ("Counterparty") are notified that as reflected on the books and records of

[Dealer name] you are the owner of an amount of precious or industrial metal equal to your order(s) of this date." But in his April 11, 2012 email to Martin and others recommending that Hunter Wise use his new form, Grossman acknowledged that customers received nothing more than a book entry:

> The document, [*sic*] is simply an educational piece explaining to the customer (on behalf of the retail dealer) that the customer has an economic interest in its dealer's position who in turn has an economic position in [Hunter Wise's] positions, who in turn has an economic interest in its supplier's positions, etc….Notwithstanding, [*sic*] these book entries, though the customer is the owner for his risk and benefit of product.

Despite this admission, nowhere in Grossman's Transfer of Precious and Industrial Metal was it disclosed to customers that Hunter Wise made book entries instead of selling physical metals, nor was it disclosed that customers received, at most, an economic interest in derivatives positions held offshore in Hunter Wise's name—in effect, the precise opposite of the tangible product that customers were told they had purchased.

61.     On several occasions, Grossman and Gaudino discussed the Transfer of Precious and Industrial Metals form while Grossman was drafting it. These discussions further demonstrated Grossman's knowledge that the form was misleading.

62.     For example, in a July 18, 2011 phone call between Grossman and Gaudino that was taped by Gaudino, the following conversation occurred:

| | |
|---|---|
| Grossman: | All right. The transfer of commodity, I think you've seen it now, I got it to you? |
| Gaudino: | Yeah. I read through it. |
| Grossman: | Uh-huh. |
| Gaudino: | So— |
| Grossman: | Complicated. |
| Gaudino: | Yeah. Yeah. |

| Grossman: | Yeah.  But what it does is explain—it's like a disclosure document, explains what's really happening— |
| Gaudino: | Um-hmm. |
| Grossman: | —and explains that it's a matched book that everybody is dealing with. |
| Gaudino: | Right. |
| Grossman: | And you can get delivery, but you can't say, "Where's my gold" and trace it back to a particular product. |
| Gaudino: | Right. |

63.     The following day, on July 19, 2011, Grossman and Gaudino again discussed the

Transfer of Precious and Industrial Metals form in a phone call taped by Gaudino:

| Gaudino: | So on the new—on the new ones, are they going to say "nonnegotiable" as well? |
| Grossman: | No. |
| Gaudino: | Okay. |
| Grossman: | They actually tell the fact that all the dealers hedge their position. |
| Gaudino: | Um-hmm. |
| Grossman: | And dealers don't hedge position from position, they hedge a net position. |
| Gaudino: | Right. |
| Grossman: | And therefore, there isn't—every client's position is covered and if you request it, there are sources to deliver from. |
| Gaudino: | Right. |
| Grossman: | And so we're telling the truth.  That's exactly what happens.  Because Hunter Wise doesn't—when you—when you buy 250 ounces of silver, they don't go in and buy 250 ounces of silver. |
| Gaudino: | Um-hmm. |
| Grossman: | They have three people selling 200—200 ounces of silver.  That gives them 450 extra and they have another two people buying, so they buy 650.  They don't buy and sell it all the time.  They just net it all out. |
| Gaudino: | Right. |

| Grossman: | And there's no way of following any one person's position back to some dealer. |
|---|---|
| Gaudino: | Right. |
| Grossman: | Yeah.  So that's what the—that—in very subtle ways, that's what the transfer of precious industrial metals says. |
| Gaudino: | Um-hmm. |
| Grossman: | And it gets the client to admit that he understands that and that he's ready, willing and able to take delivery if, in fact, he orders it. |
| Gaudino: | Right. |
| Grossman: | So, what we're trying to create is something that the regulators can say— can't say to us, "Well, you told them that you bought the metal.  I want to see that metal with their name on it." |

64.     Notwithstanding these statements to Gaudino, nowhere did Grossman's Transfer of Precious and Industrial Metal disclose the existence of a "matched book," hedged "net positions," or anything of the sort.  Instead, customers were told they owned the precious or industrial metal they had purchased, an outright lie.

65.     Hunter Wise issued Grossman's Transfer of Precious and Industrial Metals to many of its retail customers, including those solicited by Joseph Glenn, beginning as early as April 2012.

### d.      Grossman misled courts and the CFTC

66.     Hunter Wise dealers were frequent targets of litigation brought by defrauded retail customers.  In his representation of dealers in those litigations, Grossman undertook to do more than merely represent his clients' interests aggressively.  He knowingly made false representations and omissions of material fact about the nature of Hunter Wise's retail commodity transactions in an attempt to forestall or fend off court orders that might put Hunter Wise dealers out of business.

### 1.    *Kremers v. Joseph Glenn*

67.    In *Kremers v. Joseph Glenn Commodities, LLC*, Case No. 9:12-cv-80510-DMM (S.D. Fla., filed May 11, 2012), a retail customer solicited by Joseph Glenn alleged fraud, unauthorized trading, and other violations of law.  The plaintiff claimed he sent Joseph Glenn $100,000 to purchase that amount of physical gold in April 2011, but later received a trade confirmation and Transfer of Commodity form indicating that, unbeknownst to him, Joseph Glenn had sold him 160 ounces of gold for more than $250,000, of which $179,365 was financed.  (*Kremers*, Compl. 3, ¶¶ 13-16, May 11, 2012, ECF 1.)

68.    Ultimately, the customer lost $98,898 of his initial $100,000.  (*Kremers*, Order Granting Pl.'s Mot. for Sanctions and Entry of Default 9, Feb. 26, 2013, ECF 39.)

69.    In June 2012 motions to dismiss the complaint and amended complaint on behalf of his clients Joseph Glenn and Pulieri, Grossman characterized the Plaintiff's purchase as a "purchase of cash gold metal."  (*Kremers*, Defs.' Mot. to Dismiss 5, ¶ 11, June 6, 2012, ECF 5; Defs.' Mot. to Dismiss Am. Compl. 5, ¶ 11, June 29, 2012, ECF 10.)  This characterization was fundamentally misleading and Grossman knew it, since Joseph Glenn did not have gold in its possession, had not sold the customer cash gold, and in fact had not sold customers physical metal in any of its retail commodity transactions.

### 2.    *McManus v. LAM*

70.    In another example, in *McManus v. Lloyds Asset Mgmt., LLC*, Case No. 50 2011-CA 007190XXXX-MB AE (Fla. Cir. Ct., filed May 16, 2011), retail customers of LAM alleged fraud and negligent misrepresentation, among other things, regarding their financed purchases of metal.

71.    In summary judgment papers he filed with the court on October 29, 2012 on behalf of his clients Lloyds, LAM, Gaudino, Burbage, and Burbage's wife, Grossman stated that

the misrepresentations alleged in the complaint were "by law not misrepresentations at all as each statement, whether said to Plaintiffs or not, constitutes truth, mere sales puffery, or a statement that could have been easily researched by the Plaintiffs." (*McManus*, Defs.' Mot. and Mem. for Summ. J. 19, Oct. 29, 2012, Doc. No. 71).

72.     Grossman then addressed each misrepresentation alleged by the plaintiffs, including one in paragraph 57 of the second amended complaint regarding the existence of metals: "The Plaintiffs would be purchasing actual bullion which would be held in a segregated account by LAM." (*Id.* at 22.)  Rebuffing this alleged misrepresentation, Grossman stated, "Plaintiffs received notice to this effect….Although no metal was moved unless the Plaintiffs requested delivery of the physical bullion, Plaintiffs purchased actual bullion through LAM who in turn purchased the bullion from its counterparty." (*Id.*)  Grossman knew that no actual bullion existed at any point in the retail commodity transactions chain, making this statement completely false.

### 3.     *Hunter Wise v. CFTC*

73.     Attempting to avoid a CFTC injunctive action against Hunter Wise, Grossman filed a declaratory action against the CFTC on behalf of Hunter Wise, *Hunter Wise Commodities, LLC v. Commodity Futures Trading Commission*, Case No. 1:12-cv-07656 (N.D. Ill., filed Sept. 25, 2012) ("*Hunter Wise v. CFTC*"), in which he tried to maintain the illusion that Hunter Wise and its dealers sold physical metals to customers.

74.     In the *Hunter Wise v. CFTC* complaint, Grossman stated that Hunter Wise "obtains metal to satisfy its obligations to its counterparty-dealers and/or for its own account in a similar manner from other wholesale dealers of precious and/or industrial metals," and that:

> Metal associated with these purchases typically is held in a depository/warehouse for safekeeping and storage.  It is rarely transferred from one depository to another due to security reasons, costs of transportation and to avoid the costs of

weighing and assaying the quality of the metal to assure the volume and quality of the metal meets the terms of the contract between the parties.

(*Hunter Wise v. CFTC*, Compl. 4, ¶¶ 15-16, Sept. 25, 2012, ECF 1.)

75.     Despite these representations, Grossman knew that Hunter Wise and its dealers had no metal in a depository to transport, weigh, or assay for its retail commodity transaction customers.  Further, Hunter Wise did not own, possess, or have title to physical metals as a result of trades in its margin accounts, a fact made clear in the agreements governing those accounts.

### 4.     *CFTC v. Hunter Wise*

76.     In December 2012, the CFTC filed *CFTC v. Hunter Wise*, an injunctive action against Hunter Wise, Lloyds, and several of their metals dealers.

77.     On January 22, 2013, Grossman filed a motion to dismiss on behalf of Hunter Wise, Martin, and Jager stating, among other things, that in financed transactions, "[Hunter Wise] will deliver all of the precious metal to a depository or other destination as it deems appropriate within seven (7) days, or such lesser period as required by law, to be held by or for the retail [d]ealer." (*CFTC v. Hunter Wise,* Mot. to Dismiss 8, ¶ 22, Jan. 22. 2013, ECF 33).  But Hunter Wise did not deliver precious metal to a depository within 7 days or any other timeframe for financed purchases, and Grossman knew it.

78.     Grossman argued on behalf of Hunter Wise, Martin, and Jager at the February 21, 2013 preliminary injunction hearing in *CFTC v. Hunter Wise*.  In doing so, he stated, "A-Mark has possession of the metal" and that title to the metal passed from A-Mark to Hunter Wise, and then to Lloyds, and eventually to retail customers.  (*CFTC v. Hunter Wise*, Tr. of Prelim. Inj., pp. 30:22-31:4, 33:8-16, ECF 85-87.)   In reality, Hunter Wise never received title it could pass on to anyone as a result of its margin trades with A-Mark or other firms.

79.     Grossman also argued during the February 21, 2013 preliminary injunction hearing that under the Uniform Commercial Code, a seller may sell and pass title to inventory out of a fungible mass so long as he gives the purchaser notice that provides a trail by which the purchaser can identify the inventory, and further that Hunter Wise sold and passed title to metals in this manner.  (*Id.*, pp. 32:21-33:16, 41:6-14.)  Grossman failed to disclose, however, that this analysis was completely inapplicable to Hunter Wise, because it had no fungible mass of metals from which to sell.

### e.     Grossman benefited from his role in Hunter Wise's fraudulent scheme

80.     Between July 2011 and March 2013, Grossman billed Hunter Wise more than $861,400 for his and his law firm's services, collecting more than $565,500.  During the same time period, he billed Lloyds more than $413,500, collecting more than $115,000.  He earned additional sums from representing Hunter Wise dealers.

81.     Notwithstanding the amounts he billed Hunter Wise, Lloyds, and his dealer clients, Grossman sought to identify new lines of business for his clients that would generate additional profits for them—and himself—at the expense of retail customers.

82.     For example, after he emailed Martin and Jager his May 2012 Proposal, in which Hunter Wise sought to obtain financing to purchase or gain access to an inventory of metals from another of Grossman's clients, Jager asked Grossman which party he represented in the proposed transaction.  Grossman responded in a May 28, 2012 email to Martin and Jager, copying his other client:

> I am not representing either side as counsel though, but attempting to broker an opportunity between the two of you.  I don't intend to charge either of you my hourly legal fees.  (If extensive travel is necessary, I would expect each of you to share in covering my costs.)

On the other hand, if a business deal comes together, I would expect each of you to give me a participation in your opportunity.  I expect my participation on each side would be generous.  I have worked with [his other client] in this manner before, and I am completely comfortable with his fairness.  I have now represented your interests for the past two and a half years, and my trust in you is equal to my trust in [his other client].  I also expect that each of you will be somewhat aware of my economic opportunity with the other side, and will be concerned about the security of my interest.

83.     Grossman also expected to share in profits generated by a program he tried to develop for Lloyds that would allow it to sell options on Hunter Wise's "inventory" of metal.  In a July 27, 2011 phone call that was taped by Gaudino, Grossman promised Gaudino that if the program worked, "you would have access to their book and making money off it…Me too, I would take a participate—participation in this one."

**B.      Grossman Aided and Abetted AmeriFirst's Fraudulent Scheme**

**1.      Background of AmeriFirst's Business Model**

84.     Between at least November 2011 and February 25, 2013, AmeriFirst operated a scheme in which it purported to sell physical metals, including gold, silver, and platinum, to retail customers in off-exchange transactions on a leveraged, margined, or financed basis through a network of approximately 30 metals dealers.

85.     AmeriFirst recruited metals dealers to operate on the ground level.  Through websites and by phone, these dealers solicited retail customers and prospective retail customers to enter into retail commodity transactions.  Their sales pitches typically included the following claims:  (1) customers could purchase physical metals by paying as little as 20% of the purchase price; (2) the dealer would lend the customer the remaining portion of the purchase price for a finance charge; and (3) the dealer would transfer the total quantity of physical metal purchased to the customer, to be held in a depository.

86.     However, when a customer placed an order to purchase physical metals, the dealer failed to purchase and store any physical metals or disburse any loan funds.  Instead, the dealer simply passed order details and customer funds to AmeriFirst.

87.     AmeriFirst used a portion of customer funds it received from dealers to purchase physical metals, purportedly to cover the paid portion of customer purchases, but it did so in an account in its own name at FideliTrade.  In fact, the account agreement between AmeriFirst and FideliTrade specifically stated:  "[A]ny bullion held at FideliTrade will be those of [AmeriFirst] and not [AmeriFirst's] customers," and none of the metal that AmeriFirst purchased in this account was ever transferred or allocated to AmeriFirst's retail customers or dealers.

88.     AmeriFirst also entered into relationships with two entities, purportedly to acquire interests in gold positions to cover the financed portion of customer purchases.  Throughout AmeriFirst's operation, it maintained a relationship with African Trading Partners LLC ("African Trading"), a Florida company based in Fort Lauderdale, Florida.  In January and February 2013, AmeriFirst also had a relationship with American Capital Partners (Ghana) Limited Inc. ("ACP Ghana"), a Florida foreign corporation based in Palm Beach, Florida.  AmeriFirst contracted with each company to purchase approximately $20 million in gold that was purportedly located in Africa, although it paid each company less than 1.5% of that value on an annual basis.  AmeriFirst never took possession of—or even saw—the gold, which was to be held solely in its name.  In fact, the gold did not exist.

89.     Between November 2011 and February 2013, AmeriFirst took in at least $9.7 million from retail customers who entered into retail commodity transactions.  Nearly all of these customers were retail customers and not ECPs, as that term is defined in the Act.

2.      **Grossman's Role in AmeriFirst's Fraudulent Scheme**

90.     Grossman served as legal counsel for AmeriFirst between approximately November 2011 and late February 2013.  He convinced its principals that he could make their business compliant with Dodd-Frank, even though he knew AmeriFirst did not actually purchase sufficient physical metals to cover its sales to dealers and retail customers or disburse loan funds, and even though he knew that the metal AmeriFirst did purchase was in its own name.  Once again, Grossman's reach ultimately extended to retail customers in the form of fraudulent documents that Grossman drafted or reviewed, including commodity transfer forms that deceived customers each time they entered into retail commodity transactions.

a.      **Grossman knew AmeriFirst did not purchase sufficient physical metals to cover its sales or disburse loans but advised them that they could do business, even after Dodd-Frank**

91.     Around the time AmeriFirst was formed in October 2011 to take over a predecessor company, D'Onofrio and Piccininni, two of its principals, met with Grossman, told him they wanted their new company to do business along the lines of Hunter Wise, and asked if that was possible in light of Dodd-Frank.  They provided him with a copy of AmeriFirst's contract with FideliTrade, which clearly established that retail customers received neither transfer nor allocation of metals.  They also described their business model to Grossman, walking him through a typical customer transaction from start to finish.  Grossman told them he could give them a "completely defendable business model," or words to that effect.

92.     Based on Grossman's advice, AmeriFirst acted as a metals clearing firm similar to Hunter Wise.

93.     On February 21, 2013, D'Onofrio attended the preliminary injunction hearing in *CFTC v. Hunter Wise*.  After the court granted the CFTC's motion for a preliminary injunction, D'Onofrio informed Piccininni that he no longer believed AmeriFirst was "defendable," as

Grossman had advised them.  They prepared a letter informing AmeriFirst's dealers that it would no longer accept any orders or new customers as of February 22, 2013, and that it would be closing out all positions.

94.     AmeriFirst ceased doing business on February 25, 2013.

**b.     Grossman's misrepresentations reached retail customers**

95.     Grossman created the commodity transfer form that AmeriFirst used, called a "Notice of Allocation."

96.     Just like the Transfer of Precious and Industrial Metal that Grossman created for Hunter Wise, Grossman's Notice of Allocation for AmeriFirst fraudulently misrepresented to customers that they had purchased physical metals from the dealer.  And once again, due to its very nature, Grossman expected and knew that retail customers would receive it.

97.     Specifically, the Notice of Allocation listed the total amount of metal purportedly purchased by the customer, including the financed portion, noted the "action taken" as "allocated," and stated:

> If the above transaction is a purchase of precious or industrial metal, you hold for your risk and benefit an interest on an amount of precious or industrial metal equal to your order(s) as documented above….[Dealer] either possesses or has corresponding commitments from counterparties from whom [Dealer] purchased comparable product equal to or exceeding your purchase.

98.     Nowhere in his Notice of Allocation form did Grossman disclose that AmeriFirst's dealers maintained no inventory of metal, or that AmeriFirst purchased only enough physical metals to cover the fully paid portion of customer purchases—and then solely in its own name.  Grossman's Notice of Allocation also failed to disclose that AmeriFirst purported to cover the financed portion of customer purchases with investments in nonexistent gold in Africa.

### c.   Grossman vetted African Trading

99.   When AmeriFirst's principals first sought to obtain coverage for the financed portion of customer purchases of metals, they discussed with Grossman whether an arrangement with African Trading would suffice.  African Trading supplied AmeriFirst's principals with a dossier of material, and they gave it to Grossman.  Grossman reviewed the dossier, spoke with an African Trading representative, and revised the agreement that African Trading proposed to use with AmeriFirst.  He did not visit Africa to ensure that the metal existed or conduct any other due diligence into whether African Trading was legitimate.  And yet, despite the fantastic nature of African Trading's offer to sell AmeriFirst millions of dollars' worth of gold in Africa, and for payments of only 1.5% of that value on an annual basis, Grossman advised AmeriFirst that he approved of the arrangement.  Of course, African Trading was not legitimate, and the gold did not exist.

### d.   Grossman benefited from his role in AmeriFirst's scheme

100.   Grossman collected more than $75,000 for his and his firm's legal services in connection with AmeriFirst's retail commodity transactions business.

## VIII.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE

### Aiding and Abetting Off-Exchange Transactions in Violation of Section 4(a) of the Act

101.   Paragraphs 1 through 100 are realleged and incorporated herein by reference.

102.   Pursuant to Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D), the retail commodity transactions in which Hunter Wise, Lloyds, Secured Precious Metals, Joseph Glenn, and AmeriFirst engaged were subject to Section 4(a) of the Act, 7 U.S.C. § 6(a), "as if" they were contracts of sale of a commodity for future delivery.

103.     Between July 16, 2011 and February 25, 2013, Hunter Wise violated Section 4(a) of the Act, 7 U.S.C. § 6(a), by entering into, executing, and confirming the execution of off-exchange retail commodity transactions.

104.     Between July 16, 2011 and February 25, 2013, Lloyds violated Section 4(a) of the Act, 7 U.S.C. § 6(a), by confirming the execution of and conducting an office or business in the United States for the purpose of accepting orders for, or otherwise dealing in, off-exchange retail commodity transactions.

105.     Between July 16, 2011 and June 20, 2012, Secured Precious Metals and Joseph Glenn violated Section 4(a) of the Act, 7 U.S.C. § 6(a), by offering to enter into, entering into, and confirming the execution of off-exchange retail commodity transactions.

106.     Between November 2011 and February 25, 2013, AmeriFirst violated Section 4(a) of the Act, 7 U.S.C. § 6(a), by offering to enter into, entering into, confirming the execution of, and conducting an office or business in the United States for the purpose of accepting orders for, or otherwise dealing in, off-exchange retail commodity transactions.

107.     Grossman willfully aided, abetted, counseled, commanded, induced, or procured the commission of the acts constituting violations of Section 4(a) of the Act committed by Hunter Wise, Lloyds, Secured Precious Metals, Joseph Glenn, and AmeriFirst, or acted in combination or concert with Hunter Wise, Lloyds, Secured Precious Metals, Joseph Glenn, and AmeriFirst in such violations.  Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Grossman is therefore liable for the violations of Section 4(a) of the Act by Hunter Wise, Lloyds, Secured Precious Metals, Joseph Glenn, and AmeriFirst.

## COUNT TWO

### Aiding and Abetting Fraud in Violation of Section 4b of the Act

108.     Paragraphs 1 through 100are realleged and incorporated herein by reference.

109.     Pursuant to Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D), the retail commodity transactions in which Hunter Wise and AmeriFirst engaged were subject to Section 4b of the Act, 7 U.S.C. § 6b, "as if" they were contracts of sale of a commodity for future delivery.

110.     Between July 16, 2011 and February 25, 2013, Hunter Wise violated Section 4b of the Act, 7 U.S.C. § 6b, by making false representations and omissions of material fact to retail customers in connection with retail commodity transactions.

111.     Between November 2011 and February 25, 2013, AmeriFirst violated Section 4b of the Act, 7 U.S.C. § 6b, by making false representations and omissions of material fact to retail customers in connection with retail commodity transactions.

112.     Grossman willfully aided, abetted, counseled, commanded, induced, or procured the commission of the acts constituting violations of Section 4b of the Act committed by Hunter Wise and AmeriFirst, or acted in combination or concert with Hunter Wise and AmeriFirst in such violations.  Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Grossman is therefore liable for the violations of Section 4b of the Act by Hunter Wise and AmeriFirst.

### COUNT THREE

**Aiding and Abetting the Use or Employment of Deceptive Devices or Contrivances in Violation of Section 6(c)(1) of the Act and Regulation 180.1**

113.     Paragraphs 1 through 100 are realleged and incorporated herein by reference.

114.     Between August 15, 2011 and February 25, 2013, Hunter Wise intentionally or recklessly used or employed a manipulative or deceptive device, scheme, or artifice in connection with any contract of sale of any commodity in interstate commerce by making false representations and omissions of material fact to retail customers in connection with retail

commodity transactions in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1, 17 C.F.R. § 180.1.

115.    Between November 2011 and February 25, 2013, AmeriFirst intentionally or recklessly used or employed a manipulative or deceptive device, scheme, or artifice in connection with any contract of sale of any commodity in interstate commerce by making false representations and omissions of material fact to retail customers in connection with retail commodity transactions in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1, 17 C.F.R. § 180.1.

116.    Grossman willfully aided, abetted, counseled, commanded, induced, or procured the commission of the acts constituting violations of Section 6(c)(1) of the Act and Regulation 180.1 committed by Hunter Wise and AmeriFirst, or acted in combination or concert with Hunter Wise and AmeriFirst in such violations.  Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Grossman is therefore liable for the violations of Section 6(c)(1) of the Act and Regulation 180.1 by Hunter Wise and AmeriFirst.

## IX.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.    Find Grossman liable for violating Sections 4(a), 4b, and 6(c)(1) of the Act, 7 U.S.C. §§ 6(a), 6b, and 9(1), and Regulation 180.1, 17 C.F.R. § 180.1, pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a);

B.    Enter an order of permanent injunction enjoining Grossman and all persons insofar as they are acting in the capacity of his agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with

Grossman who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

1.      engaging in conduct in violation of Sections 4(a), 4b, and 6(c)(1) of the Act, 7 U.S.C. §§ 6(a), 6b, and 9(1) (2012), and Regulation 180.1, 17 C.F.R. § 180.1 (2013);

2.      trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40)) (2012);

3.      entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3(hh), 17 C.F.R. § 1.3(hh) (2013)) ("commodity options"), security futures products, swaps (as that term is defined in Section 1a(47) of the Act, 7 U.S.C. § 1a(47) (2012), and further defined by Regulation 1.3(xxx), 17 C.F.R. § 1.3(xxx) (2013), or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts"), for his own personal account or for any account in which he has a direct or indirect interest;

4.      having any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts traded on his behalf;

5.      controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts;

6.      soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts;

7.      applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013); and

8.      acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2013)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)) registered, exempted from registration, or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013);

C.      Enter an order directing Grossman to pay a civil monetary penalty in the amount of not more than the greater of:  (1) triple the monetary gain to Grossman for each violation of the Act; or (2) $140,000 for each violation of the Act;

D.      Enter an order requiring Grossman to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

E.      Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Respectfully submitted,

Date: September 9, 2014

  /s/ Stephanie Reinhart
Stephanie Reinhart
Special Bar ID # A5501605
(312) 596-0688 (phone)
sreinhart@cftc.gov


  /s/ Jennifer E. Smiley
Jennifer E. Smiley
Special Bar ID # A5501600
(312) 596-0530 (phone)
jsmiley@cftc.gov


  /s/ Rosemary Hollinger
Rosemary Hollinger
Special Bar ID # A5500849
(312) 596-0520 (phone)
rhollinger@cftc.gov


**Attorneys for the U.S. Commodity Futures Trading Commission**
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0714 (facsimile)